UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARVIN PITTS; and O'DELL WILLIS,

                            Plaintiffs,

v.                                                              5:04-CV-0828
                                                                (GTS/GJD)
ONONDAGA COUNTY SHERIFF'S DEP'T; and
KEVIN WALSH, Onondaga County Sheriff,

                            Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

MARVIN PITTS
  Plaintiff, *Pro Se*
564 Oakwood Avenue
Syracuse, NY 13205

O'DELL WILLIS
  Plaintiff, *Pro Se*
468 Stafford Avenue
Syracuse, NY 13202

HON. GORDON J. CUFFY                          JOHN W. SHARON, ESQ.
Onondaga County Attorney                      Deputy County Attorney
  Counsel for Defendants
John H. Mulroy Civic Center, 10th Floor
421 Montgomery Street
Syracuse, NY 13202

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court in this *pro se* employment civil rights action is Defendants'

motion for summary judgment.  For the reasons set forth below, Defendants' motion is granted in

part and denied in part, Plaintiff Pitts' claims are dismissed in their entirety, and all of Plaintiff

Willis' claims are dismissed except his hostile work environment claim.

I.      **RELEVANT BACKGROUND**

      A.      **First Employment Civil Rights Action**

On July 8, 1997, Arthur Barksdale, an African-American deputy sheriff in the Onondaga County Sheriff's Department, filed an employment civil rights action against Onondaga County. *See Barksdale et al. v. Onondaga County Sheriff's Dep't*, 97-CV-0966, Complaint (N.D.N.Y. filed July 8, 1997).[1]  On October 29, 1997, an Amended Complaint was filed in that action by Mr. Barksdale and some of his fellow deputy sheriffs, including Marvin Pitts and O'Dell Willis. *See Barksdale et al. v. Onondaga County Sheriff's Dep't*, 97-CV-0966, Amended Complaint (N.D.N.Y. filed Oct. 29, 1997).

In his Amended Complaint, Mr. Pitts asserted two claims: (1) claim of a racially hostile work environment at the Justice Center between May 1, 1987 (the date his employment began with the Sheriff's Department), and July 1, 1997, due to the use of racially derogatory names, the failure to promote African-American deputies and white deputies equally, the failure to discipline African-American deputies and white deputies equally, and the failure to remedy complaints of discrimination; and (2) a claim that "Defendant attempted to terminate [him] for not bringing in a doctor's excuse for an absence." *Id*. at ¶¶ 15, 20-22, 55-64, 107-24.  In addition, Mr. Willis asserted claims of a racially hostile work environment at the Justice Center between October 28, 1987 (the date his employment began with the Sheriff's Department), and July 1, 1997, due to the use of racially derogatory names, the failure to promote African-

---

      [1]      In this first employment discrimination action, Mr. Barksdale asserted several, if not all, of the causes of action that he asserted in the current action, which arose from incidents that he had experienced while employed with the Onondaga County Sheriff's Department. *Id*.

American deputies and white deputies equally, the failure to discipline African-American deputies and white deputies equally, and the failure to remedy complaints of discrimination. *Id.* at ¶¶ 15, 20-22, 39, 64-75, 107-124.

On September 5, 2000, Mr. Pitts, through counsel, signed a stipulation of withdrawal of his claims from that action with prejudice. *See Barksdale et al. v. Onondaga County Sheriff's Dep't*, 97-CV-0966, Stipulated Withdrawal (N.D.N.Y. filed Sept. 5, 2000).  On February 8, 2001, United States District Judge Norman A. Mordue issued a Memorandum-Decision and Order dismissing with prejudice (as a sanction for failing to comply with discovery requests) the claims of all remaining Plaintiffs, including the claims of Mr. Willis. *See Barksdale et al. v. Onondaga County Sheriff's Dep't*, 97-CV-0966, Memorandum-Decision and Order (N.D.N.Y. filed Feb. 8, 2001) (Mordue, J.) (granting defendants' motion to dismiss with prejudice plaintiffs' complaint in its entirety, pursuant to Fed. R. Civ. P. 41[b]).

**B.     Current Employment Discrimination Action**

On July 16, 2004, eleven (11) African-American deputy sheriffs in the Onondaga County Sheriff's Department filed the current employment civil rights action arising out of a variety of incidents that occurred at the Public Safety Building and the Justice Center in Onondaga County over a period of twenty (20) years.  (Dkt. No. 1.)  On August 5, 2004, they filed an Amended Complaint.  (Dkt. No. 3.)  Generally, the Amended Complaint alleges that Defendant Onondaga County knowingly permitted a racially hostile work environment to exist and continue.  (*Id.*)

Over the course of the next three years, some of the Plaintiffs agreed to withdraw from the action.  As a result, on April 30, 2007, an Order reflecting their dismissal was issued by Judge Scullin.  (Dkt. No. 31.)  At this time, the only remaining Plaintiffs in this action are O'Dell

3

Willis, who is currently employed by the Onondaga County Sheriff's Department, and Marvin

Pitts, who was terminated from the Sheriff's Department in early 1997.

Liberally construed, Plaintiffs' Amended Complaint asserts the following claims by Mr.

Willis: (1) between approximately 1987 (when his employment began at the Sheriff's

Department) and August 5, 2004 (the date of Plaintiffs' Amended Complaint), Mr. Willis was

subjected to a racially hostile work environment and disparate treatment in that he heard African

American inmates and deputies, including himself, called racially derogatory names by white

deputies; (2) between 1987 and August 2004, he was subjected to a sexually hostile work

environment and disparate treatment in that he was subject to offensive sexual remarks and

touching by white deputies, which his superiors were aware of; and (3) between 1987 and

August 2004, he has been subjected to retaliatory discipline due to his complaints about the

foregoing violations.  (Dkt. No. 3, ¶¶ 34-39, 97-107.)  Furthermore, Plaintiffs' Amended

Complaint asserts the following claims by Mr. Pitts: (1) at various points in time up until his

termination, Mr. Pitts was subjected to a racially hostile work environment and disparate

treatment in that he heard African American inmates and deputies, including himself, called

racially derogatory names by white deputies; and (2) at some point in time, he was subjected to

disparate treatment in that he was wrongfully terminated while on medical leave because of his

race.  (Dkt. No. 3, ¶¶ 40-43, 97-107.)

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial."  Fed. R. Civ. P. 56(e)(2).

As for the *materiality* requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248 [citation omitted].

As for the *genuineness* requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party."  *Id*.  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a *genuine* issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted; emphasis added]; *see also* Fed. R. Civ. P. 56(e)(2).[2]  Similarly, inadmissible hearsay is insufficient to create a *genuine* issue of fact, "absent a showing that admissible evidence will be available at trial."  *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*., 769 F.2d 919,

---

[2]        As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) [citations omitted].

924 (2d Cir. 1985) [citations omitted].  Moreover, "an affidavit . . . that, by omission or addition, contradicts the affiant's previous deposition testimony" is insufficient to create a *genuine* issue of fact.  *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) [citations omitted].

Finally, as this Court has previously observed, "It is well established that issues of credibility are *almost never* to be resolved by a court on a motion for summary judgment."  *Cruz v. Church*, 05-CV-1067, 2008 WL 4891165, at *4 & n.6 (N.D.N.Y. Nov. 10, 2008) (Suddaby, J.) [emphasis in original; collecting cases].  However, "there is a *narrow exception* to this well-established rule."  *Cruz*, 2008 WL 4891165, at *4 [citation omitted].  In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit explained that this narrow exception is for testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility (because the testimony is incomplete and/or replete with inconsistencies and improbabilities) that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant.  *Cruz*, 2008 WL 4891165, at *4 & n.7 [collecting cases].  "Again, it must be remembered that the circumstances giving rise to this exception are rare."  *Id.* & n.7 [collecting cases].

## III.   DISCUSSION

### A.   Claims Against the Onondaga County Sheriff's Department

As a preliminary matter, the Court finds that the Onondaga County Sheriff's Department is merely an "administrative arm of the same municipal entity–the County–and thus lack[s] the

capacity to be sued." *Crews v. County of Nassau*, 06-CV-2610, 2007 WL 4591325, at *1, n.1

(E.D.N.Y. Dec. 27, 2007); *see also Caidor v. M & T Bank*, 05-CV-0297, 2006 WL 839547, at *2

(N.D.N.Y. March 27, 2006) (Scullin, J.).

As a result, the Court dismisses Plaintiffs' claims against the Onondaga County Sheriff's
Department. To the extent that any of Plaintiff's claims of municipal liability survive the current

motion, the proper party against which those claims may be brought is Onondaga County.

**B.     Doctrine of Res Judicata**

Defendants argue that, as a result of the prior action, the doctrine of res judicata bars all

claims asserted by Plaintiff Pitts, and all claims asserted by Plaintiff Willis arising out of

incidents that occurred prior to the 1997 lawsuit. In his response, Plaintiff Pitts argues that the

doctrine of res judicata does not bar his current allegations because the claims asserted in the

1997 lawsuit were different than those asserted in the current lawsuit. Similarly, Plaintiff Willis

argues that "in the prior complaint that was dismissed, [he] did not make any claims about the

sexually harassing conduct of white deputies that [he] complain[s] about in this lawsuit, or about

the racially hostile conduct of white deputies putting [him] at risk with inmates." Finally,

Plaintiff Willis argues that "there is no way these things could have been included in the first

lawsuit because they had [not] happened when [he] filed [his] initial complaint with the EEOC

[Equal Employment Opportunity Commission]."

"The res judicata principle prevents a plaintiff from litigating claims that were or could

have been raised in a prior action against the same defendant." *Farbstein v. Hicksville Public
Library*, 323 F. Supp.2d 414, 423 (E.D.N.Y. 2004) (citing *L-Tec Elecs. Corp. v. Cougar Elec.
Org., Inc.*, 198 F.3d 85, 87-88 (2d Cir. 1999) [per curiam]). "Even claims based upon different

legal theories are barred provided they arise from the same transaction or occurrence." *L-Tec*

*Elecs. Corp.*, 198 F.3d at 88.

"A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action." *Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir. 1986). "Such a dismissal constitutes a final judgment with the preclusive effect of 'res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit.'" *Nemaizer*, 793 F.2d at 60 (citing *Heiser v. Woodruff*, 327 U.S. 726, 735 [1946] [other citation omitted]). "A dismissal with prejudice arising out of an agreement of the parties is an adjudication of all matters contemplated in the agreement, and a court order which memorializes this agreement bars further proceedings." *Id*.

"The dismissal of an action, with prejudice, for failure to comply with discovery orders is [also] a judgment on the merits." *Snyder v. Yonkers Public School Dist.*, 315 F. Supp.2d 499, 502 (S.D.N.Y. 2004) (citing *Nasser v. Isthmian Lines*, 331 F.2d 124 [2d Cir. 1964]); *see also* Fed. R. Civ. P. 41(a)(2) ("If the plaintiff fails to . . . comply with these rules [including Fed. R. Civ. P. 37] or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, the dismissal . . . operates as an adjudication on the merits."). Indeed, "[t]he Second Circuit has squarely held that when a first action is dismissed for failure to comply with discovery orders and a second action is brought on the same claim, by the same plaintiff that claim should be barred." *Snyder*, 315 F. Supp.2d at 502 (citing *Browning Debenture Holders' Comm. v. DASA Corp.*, 605 F.2d 35 [2d Cir. 1972]).

Moreover, dismissal of a Title VII claim in a second action is warranted even where the plaintiff did not have the required "right to sue letter from the EEOC when [his] [first action] was before [the Court]" because, although the Court "could not have adjudicated [the plaintiff's]

8

Title VII claim in [his first action] until [the plaintiff] received h[is] right to sue letter . . . [the]

[p]laintiff could have brought [his] Title VII claim before [the Court in his first action]. . . . [by]

amend[ing] [his] original complaint to include the Title VII claim within 90 days of receiving

that letter."  *Snyder*, 315 F. Supp.2d at 502; *see also Woods v. Dunlop Tire Corp.*, 972 F.2d 36,

41 (2d Cir. 1992) (holding that, to avoid res judicata, the plaintiff could have done the following:

[1] filed her claim and then sought a stay in the district court pending the outcome of her Title

VII administrative proceedings; or [2] filed her claim, sought a right to sue notice on her Title

VII claim from the EEOC after 180 days, and then amended the original complaint to include the

Title VII claim), *accord*, *Cieszkowska v. Grayline New York*, 01-CV-0128, 2001 WL 1131990, at

*4 (S.D.N.Y. Sept. 24, 2001).

　　　Before analyzing the doctrine's application to Plaintiffs' claims, the Court notes that

Plaintiffs' claims stemming from the 1997 lawsuit were decided on the merits.

### 1.　　Impact of Doctrine on Claims of Plaintiff Pitts

　　　Proceeding to an analysis of the doctrine's application to Plaintiffs' claims, as stated

above in Part I.B. of this Decision and Order, Plaintiffs' Amended Complaint asserts the

following claims by Plaintiff Pitts: (1) at various points in time up until August 2004, Plaintiff

Pitts was subjected to a racially hostile work environment and disparate treatment in that he

heard African American inmates and deputies, including himself, called racially derogatory

names by white deputies; and (2) at some point in time before August 2004, he was subjected to

disparate treatment in that he was wrongfully terminated while on medical leave because of his

race.  (Dkt. No. 3, ¶¶ 40-43, 97-107.)

　　　With regard to Plaintiff Pitts' claim regarding derogatory names, the Court finds that, to

the extent that such a claims arises from derogatory names heard by Plaintiff Pitts at work before

September 1997 (when he joined in the 1997 lawsuit), that claim is barred by the doctrine of res judicata.  The Court further finds that, because Plaintiff Pitts' employment with the Sheriff's Department was terminated in early 1997, any derogatory names heard by him at work must have occurred before September 1997.  As a result, the Court finds that Plaintiff Pitts' current claim regarding derogatory names is barred by the doctrine of res judicata.

With regard to Plaintiff Pitts' claim regarding discriminatory termination, the Court finds that Plaintiff Pitts was terminated in early 1997.  The Court further finds that, according to his own deposition testimony, Plaintiff Pitts learned that he had a brain tumor in the summer of 1997–*before he joined the 1997 lawsuit in September of 1997*.  Finally, the Court finds that Plaintiff could have asserted, but chose not to assert, a discriminatory termination claim in the 1997 lawsuit.  (Indeed, he actually raised the specter of such a claim in the 1997 lawsuit by alleging, "Defendant attempted to terminate [him] for not bringing in a doctor's excuse for an absence.")  As a result, the Court finds that Mr. Pitts had a full and fair opportunity to assert whatever civil rights violations he believed the County had committed in the 1997 lawsuit.

For these reasons, the Court dismisses Plaintiff Pitts' claims based on the doctrine of res judicata.

### 2.      Impact of Doctrine on Claims of Plaintiff Willis

The Court reaches a similar conclusion with regard to those of Plaintiff Willis' claims that arose prior to the filing of 1997 lawsuit.[3]  Granted, the continuing violation doctrine, which the

---

[3]      The Court notes that res judicata does not bar any claims, asserted by Plaintiff Willis arising from events that occurred after the filing of the 1997 lawsuit, on July 8, 1997.  *See Computer Assoc. Int'l v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997) ("Although a plaintiff may seek leave to file a supplemental pleading to assert a new claim based on actionable conduct which the defendant engaged in after a lawsuit commenced . . . , he is not required to do so. . . . [R]es judicata does not bar litigation of claims arising from transactions which occurred after the [prior] action was brought.") [citations omitted]; *Maharaj v. Bank of America Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("[W]hen the second action concerns a transaction occurring after the

Court discusses below, may have the effect of rendering timely an otherwise untimely claim. However, this doctrine cannot act as a vehicle to reopen claims that have already been decided.

As a result, the Court dismisses those of Plaintiff Willis' claims that arose prior to the filing of the 1997 lawsuit based on the doctrine of res judicata.  Having said that, the Court notes that claims that have been dismissed on res judicata grounds "may still be offered as evidence of discriminatory intent to support [permissible] claims."  *Klein v. New York Univ.*, 07-CV-0160, 2008 WL 3843514, at *2 (S.D.N.Y. Aug. 14, 2008).

### C.    Statute of Limitations Governing EEOC Claims

Defendants argue that Plaintiff Pitts' claims are barred by the statute of limitations because his employment was terminated in 1997, and he did not file the instant Complaint until 2004.  Defendants also argue that Plaintiff Willis' claims are barred by the statute of limitations because the last specific incident that he mentions in the Complaint occurred in 2000.  In response, Plaintiffs argue that their claims are not barred by the statute of limitations because the continuing violations doctrine applies to their claims.  Defendants reply that the continuing violation doctrine does not apply to Plaintiff Willis' claims because, *inter alia*, the events that he complains of are unrelated to one another, and occurred years apart from one another.

### 1.    Impact of SOL on Claims of Plaintiff Pitts

"Timely filing of a charge of discrimination with the EEOC is a prerequisite to filing a Title VII complaint in federal court."  *Klein v. New York University*, 07-CV-0160, 2008 WL

---

commencement of the prior litigation, claim preclusion generally does not come into play. . . . Accordingly, if, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may–but is not required to–file a supplemental pleading setting forth defendant's subsequent conduct.  Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar when he alleges defendant's later conduct as a cause of action in a second suit.") [citations omitted].

3843514, at *2 (S.D.N.Y. Aug. 14, 2008) (citing 42 U.S.C. § 2000e-5[b]).  "In New York, a plaintiff must file a charge of discrimination with the EEOC within three hundred days of the alleged discriminatory or retaliatory conduct."  *Klein*, 2008 WL 3843514, at *2 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 [2d Cir. 1998]).  "The three hundred day period serves as a statute of limitations, and claims regarding acts that occurred more than three hundred days prior to the employee's initiation of administrative review are thus time-barred[,]" unless the continuing violation doctrine applies.  *Id.* (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359 [2d Cir. 2001]).

        If a plaintiff has suffered a "continuing violation," which occurs when the "plaintiff has been subjected to a continuous practice and policy of discrimination, the statute of the limitations is not tolled until the last discriminatory act in furtherance of the policy or practice occurred."  *Id.* (citing *Washington v. County of Rockland*, 373 F.3d 310, 317 [2d Cir. 2004]).  "The continuing violation doctrine applies to claims of a very limited scope."  *Id.*  "Title VII claims that seek recovery for discrete incidents of discrimination may not be reviewed under the continuing violation doctrine."  *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 153 [2002]).  More specifically, "termination, failure to promote, denial of transfer, or refusal to hire" are "example[s] of conduct that comprise a "discrete discriminatory act[,]" to which the continuing violation doctrine does not apply.  *Id.* (citing *National*, 536 U.S. at 122).  "However, where the plaintiff alleges that the defendant has created a hostile work environment, the continuing violation doctrine is applicable."  *Id.* (citing *National*, 536 U.S. at 103).  This is because a hostile work environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice."  *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002).

One of Plaintiff Pitts' two claims is that he was improperly denied medical leave and that, ultimately, he was improperly terminated.  Again, the Court finds that Plaintiff Pitts was terminated in early 1997.  The Court finds that, by his own acknowledgment, Plaintiff Pitts filed his complaint with the EEOC regarding his termination "sometime in 2000-01."  To the extent that Plaintiff Pitts is, in this lawsuit, complaining of his termination, the continuing violation doctrine does not apply.  Furthermore, because more than three hundred (300) days lapsed between the time Plaintiff Pitts was terminated in early 1997 and the time he filed his complaint with the EEOC in 2000 or 2001, his claim of discrimination arising out of his termination is alternatively barred by the statute of limitations.

With regard to the second of Plaintiff Pitts' two claims (i.e., his claim that he was subjected to a racially hostile work environment and disparate treatment in that he heard African American inmates and deputies, including himself, called racially derogatory names by white deputies), the Court finds that the continuing violation doctrine does apply.  However, because Plaintiff Pitts was terminated in early 1997, the last discriminatory act in furtherance of the policy or practice he experienced could have occurred no later than early 1997.  As a result, Plaintiff Pitts' claim of discrimination arising from his being subjected to racially derogatory names is alternatively barred by the statute of limitations.

As a result, the Court dismisses Plaintiff Pitts' claims on the alternative ground that they are barred by the statute of limitations.

### 2.    Impact of SOL on Claims of Plaintiff Willis

As described above in Part I of this action, Plaintiff Willis' claims are as follows: (1) between approximately October 28, 1987 (when his employment began at the Sheriff's Department) and August 5, 2004 (the date of Plaintiffs' Amended Complaint), Mr. Willis was

subjected to a racially hostile work environment and disparate treatment in that he heard African American inmates and deputies, including himself, called racially derogatory names by white deputies; (2) between October 1987 and August 2004, he was subjected to a sexually hostile work environment and disparate treatment in that he was subject to offensive sexual remarks and touching by white deputies, which his superiors were aware of; and (3) between October 1987 and August 2004, he has been subjected to retaliatory discipline due to his complaints about the foregoing violations.

Moreover, as stated above in Part III.B.2. of this Decision and Order, the Court has already found that, to the extent that any of these claims are based on events occurring before the filing of Plaintiff Willis' Amended Complaint in his first employment discrimination action on October 29, 1997, those claims are barred by res judicata. With regard to any of Plaintiff Willis' claims based on events occurring *after* the filing of Plaintiff Willis' Amended Complaint in his first employment discrimination action on October 29, 1997, the Court finds that those claims may benefit from continuing violation doctrine.[4] Of course, whether Plaintiff Willis has offered

---

[4]     For example, in Plaintiff Willis' deposition, he describes a number of incidents that he believes violated his civil rights, some of which are detailed as follows. First, Mr. Willis testified that, sometime in 2000, he was regularly sexually harassed by a group of five (5) transport deputies with whom he worked. The harassing behavior included making "gay jokes," revealing their naked bodies (or body parts) to Mr. Willis, and making vulgar sexual comments to Mr. Willis. Mr. Willis complained about all of this behavior to his superiors. The Court notes that one of the five deputies that were involved in harassing Mr. Willis is black, and another is Native American. Second, Mr. Willis testified that, in August 2000, a white deputy grabbed him in a "bear hug," pressed him against a table, and "humped" him in front of other deputies, who laughed at the behavior. Mr. Willis complained of this incident to his superior sergeant; however, according to Mr. Willis, nothing happened to this deputy. Third, Mr. Willis testified that, sometime in 2000 or 2001, he was instructed to watch a video with a number of other deputies, all of whom were white. According to Mr. Willis, the video portrayed black people in a negative light, and after the video, some of the deputies made racial remarks directed at Mr. Willis in an attempt to portray him in the same light as the individuals on the video. Fourth, Mr. Willis testified that, in 2006, two white deputies informed him that they were told that, by

14

admissible record evidence to establish a claim for a hostile work environment is a separate

issue, which the Court will address below.  However, for the time being, the Court rejects

Defendants' argument that the statute of limitations bars Plaintiff Willis' claims to the extent they

are based on events occurring after October 29, 1997.

     As a result, the Court denies Defendants' motion for summary judgment to the extent it is

premised on this ground for dismissal.

     **D.**     **Claim of Hostile Work Environment**

     Turning to Plaintiffs' claim of hostile work environment, Defendants argue that Plaintiff

Willis' hostile work environment claim should be dismissed because Willis is unable to

demonstrate a specific basis on which to hold Defendants liable.  Specifically, Defendants argue

that they provided Plaintiff Willis with a reasonable avenue of complaint, and that, when Willis

underwent the proper procedures for filing a complaint, Defendants took proper remedial action.

     In response, Plaintiff Willis argues that Defendants are liable for maintaining a hostile

work environment because they were aware of the hostile environment, yet did nothing to

address the problems.  Plaintiff Willis further argues that, instead, the inappropriate behavior of

his fellow Caucasian deputies was accepted by his supervisors.

        **1.**     **Legal Standard Governing Claims of Hostile Work Environment**

     "To establish a claim of hostile work environment, a plaintiff must show that: (1) he or

she was subjected to harassment because of his or her membership in a protected class that was

---

working with Mr. Willis, they were working against "the cause."  Finally, on another occasion,
the exact date of which is not clear, Mr. Willis testified that a white male deputy placed his
genitals on Mr. Willis' legs while Mr. Willis was working at a desk.  Mr. Willis responded by
forcefully grabbing the man's genitals.  Mr. Willis complained of the incident; however, to his
knowledge, the deputy received no punishment.

so severe or pervasive as to alter the conditions of his or her employment; and (2) there is a specific basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp.2d 330, 388 (S.D.N.Y. 2002) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 118 S.Ct. 2257 (1998), *and Faragher v. City of Boca Raton*, 118 S.Ct. 2275 (1998) [other citation omitted]).

"The test for the first prong is whether the employment environment was 'objectively hostile'–that is, whether the environment was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Little*, 210 F. Supp.2d at 388 [citations and internal quotations omitted]. "The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a general civility code." *Little*, 210 F. Supp.2d 388 [internal quotation marks and citations omitted]. "Courts must distinguish between merely offensive and boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *Id.* [internal quotation marks and citations omitted].

"In determining whether a workplace is objectively hostile, a court should look at the totality of the circumstances." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 [1993]). Factors that courts should examine include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.*, 510 U.S. at 23. "When evaluating the 'quantity, frequency, and severity' of the incidents, the court must look at the incidents 'cumulatively in order to obtain a realistic view of the work

16

environment.'"  *Little*, 210 F. Supp.2d at 389 (citing *Schwapp v. Town of Avon*, 118 F.3d 106,

111 [2d Cir. 1997]).  "For acts of racial discrimination such as racist comments, slurs and jokes

to be actionable, there must be more than a few isolated incidents of racial enmity, meaning that

instead of sporadic racial slurs there must be a steady barrage of opprobrious racial comments."

*McCoy v. City of New York*, 131 F. Supp.2d 363, 372 (E.D.N.Y. 2001) (citing *Schwapp*, 118

F.3d at 110-11 [internal quotations and other citations omitted]).  "Isolated remarks or occasional

episodes of harassment will not merit relief under Title VII; in order to be actionable, the

incidents of harassment must occur in concert or with a regularity that can reasonably be termed

pervasive."  *Little*, 210 F. Supp.2d at 389 (citing *Quinn*, 159 F.3d at 768).

     "Various types of acts, depending on their severity or pervasiveness, can create a hostile

work environment."  *Id*.  "Courts have found that a series of racist comments directed at an

employee can create a hostile work environment."  *Id*. (citing *Schwapp*, 118 F.3d at 112).

"Similarly, vulgar comments and gestures directed at employees can be sufficiently offensive,

pervasive and continuous to constitute a sexually hostile work environment.  *Id*. (citing *Kotcher

v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 61, 63 [2d Cir. 1992]).  "Offensive

displays can also create a hostile work environment."  *Id*.  "For example, courts have found

sexual harassment based on a hostile work environment where employees were subjected to 'the

display of obscene visual representations or the communication of sexually offensive remarks.'"

*Id*. (quoting *Iannone v. Frederic R. Harris, Inc*., 941 F. Supp. 403, 411 [S.D.N.Y. 1996]).

"Similarly, the . . . use of racial epithets, without more, may create a hostile work environment if

sufficiently continuous and pervasive."  *Id*. (citing *Snell*, 782 F.2d at 1103).   In addition,

"[b]ecause a hostile work environment claim focuses on the nature of the workplace environment

as a whole," evidence of some instances of sexual harassment and some instances of racial

harassment may collectively constitute a hostile work environment. *Williams v. Consolidated Edison Corp. of N.Y.*, 255 F. App'x. 546, 550 (2d Cir. Nov. 27, 2007) ("Looking at the totality of circumstances and the cumulative effect of these acts, Williams has provided sufficient evidence of gender-based and race-based harassment to create a dispute as to material facts that would support her hostile work environment claim") (internal quotation marks and citation omitted) (internal quotation marks and citation omitted); *Cruz v. Coach Stores, Inc*., 202 F.3d 560, 572 (2d Cir. 2000) (holding that a jury could find that evidence of racial harassment exacerbated sexual harassment, and vice versa, given "the interplay between the two forms of harassment").

Racial or sexual epithets need not be directed at an employee to contribute to a hostile work environment, because "evidence of harassment of other members of the protected group, if part of a pervasive or continuing pattern of conduct, is surely relevant to show the existence of a hostile work environment." *Id*. (citing *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 150 [2d Cir. 1997]). Moreover, racially offensive comments or incidents of racial harassment, though different in kind and occurring in different locations, may create a racially hostile work environment in violation of Title VII. *Id*. at 391.

"Even if a work environment is found to be abusive, however, a plaintiff must establish [the second prong of the standard governing claims of hostile work environment, namely] that the conduct which created the hostile environment should be imputed to the employer." *Tomka*, 66 F.3d at 1305 (citing *Kotcher*, 957 F.2d at 63 [other citation omitted]). "[T]he Supreme Court [has] declined to announce a definitive rule on employer liability, holding instead that federal courts should be guided by common law principles of agency." *Tomka*, 66 F.3d at 1305 (citing *Meritor Savings Bank v. Vinson*, 106 S. Ct. 2399, 2408 [1986]). In light of this holding, the Second Circuit has derived certain rules to find an employer liable for permitting the existence of

a hostile work environment.  *Id.*

Pursuant to the Second Circuit's rules, "if a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses his actual or apparent authority to further the harassment, or if the supervisor was otherwise aided in accomplishing the harassment by the existence of the agency relationship."  *Id.* (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 114 S. Ct. 2693 [1994]).  "By contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless the employer either [1] provided no reasonable avenue of complaint or [2] knew of the harassment but did nothing about it."  *Id.* (citing *Karibian*, 14 F.3d at 780 and *Kotcher*, 957 F.2d at 63).

With regard to the requirement that the employer provide a reasonable avenue of complaint, an employer who does not have a sexual harassment policy does not provide a reasonable avenue for complaint.  *Brabson v. The Friendship House of W. New York*, 46 F. App'x 14, 17-18 (2d Cir. 2002).[5]  "However, there is no basis for a per se rule that the absence of a *written* . . . policy, standing alone, permits a finding that the employer has failed to provide a reasonable avenue for complaint . . . ."  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1180 (2d Cir. 1996) [citation and internal quotations omitted; emphasis added].

With regard to the requirement that the employer do something about harassment of which it has knowledge, the essence of this requirement is the *reasonableness* of the employer's

---

[5]     On the other hand, where there is a policy in place, "courts have held that no reasonable fact-finder could conclude that the employers failed to provide a reasonable avenue for employees to complain of sexual harassment or discrimination."  *Duch v. Kohn*, 04-CV-0109, 2007 WL 2230174, at *6 (S.D.N.Y. Aug. 03, 2007) (citing *Dawson v. County of Westchester*, 351 F. Supp.2d 176, 192 [S.D.N.Y. 2004] [other citation omitted])

response to the plaintiff's complaints. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.

1986) ("[W]e hold today that once an employer has knowledge of a racially combative

atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it.").[6]

Furthermore, as the Second Circuit has explained,

> Whether the company's response was reasonable has to be assessed
> from the totality of circumstances.  Factors to be considered in this
> analysis are the gravity of the harm being inflicted upon the plaintiff,
> the nature of the employer's response in light of the employer's
> resources, and the nature of the work environment.

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) (citations omitted).  Other factors

may include (1) the amount of time that elapsed between the notice and remedial action, (2)

whether the response taken comported with the employer's policies, (3) whether the co-

employees complained of were confronted and reprimanded, and (4) whether the response ended

the harassment.  *See Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162 (2d Cir. 2006);

---

[6]       *See also Brabson,* 46 F. App'x at 17 ("[The defendant] failed to show that [the plaintiff's harasser] was adequately reprimanded or that any reasonable steps were taken to prevent future conduct."); *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) ("An employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it."), *accord*, *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998); *Faulkner v. Niagara Mohawk Power Corp.*, 05-CV-0974, 2006 WL 3207815, at *7 (N.D.N.Y. Nov. 03, 2006) (McAvoy, J.) (stating that an employer will not be held liable for a hostile work environment when the employer takes "prompt and reasonable remedial action" in response to a complaint); *Dawson v. County of Westchester*, 351 F. Supp.2d 176, 192 (S.D.N.Y. 2004) (characterizing issue as whether the employer, once notified of the harassment, took "reasonable care to prevent the harassment or act promptly to correct it"); *Rechichi v. Eastman Kodak Co.*, 02-CV-6249, 2004 WL 1698333, at *6-7 (W.D.N.Y. Jan. 21, 2004) (stating that, "[w]here the harassment was caused by a non-supervisory co-worker, the burden falls to the plaintiff to prove that the employer did not take reasonable steps to address the situation") [internal quotation marks and citations omitted]; *cf.* 29 C.F.R. § 1604.11(d) (1997) (employer is liable for sexual harassment by co-worker if it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 154 (2d Cir. 1997).[7]

Of course, when there is a genuine issue of material fact as to whether or not the employer reasonably responded to the plaintiff's complaints, summary judgment is not appropriate.  However, when there is no genuine issue of material fact as to whether or not the employer reasonably responded to the plaintiff's complaints, summary judgment is appropriate. *See, e.g., Finnerty*, 176 F. App'x at 162 (affirming district court's grant of summary judgment to employer because of reasonableness of its response to the plaintiff's complaints), *accord*, *McNally v. Posterloid Corp.*, 148 F. App'x 23, 25 (2d Cir. 2005); *Faulkner v. Niagara Mohawk Power Corp.*, 05-CV-0974, 2006 WL 3207815, at *7 (N.D.N.Y. Nov. 03, 2006) (McAvoy, J.) (granting summary judgment to employer because of reasonableness of its response to the plaintiff's complaints).[8]

### 2.    Application of Legal Standard to Facts of this Case

After carefully reviewing the record, the Court concludes that, Plaintiff Willis has adduced sufficient admissible record evidence from which a rational fact-finder could conclude that the employment environment in which Willis worked was objectively hostile–i.e., Willis was subjected to harassment because of his membership in a protected class, and this harassment

---

[7]    *See also Hanna v. Boys and Girls Home and Family Servs., Inc.*, 212 F. Supp.2d 1049, 1063 (N.D. Iowa 2002) (collecting cases).

[8]    *See also Duch v. Kohn,* 04-CV-0109, 2007 WL 2230174, at *10-11 (S.D.N.Y. Aug. 3, 2007) (granting summary judgment to employer because of reasonableness of its response to the plaintiff's complaints); *cf. Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 154 (2d Cir. 1997) (affirming district court's finding that, as a matter of law, the employer took prompt and appropriate steps in response to the plaintiff's complaint); *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995) (affirming district court's granting of defendants' motion to dismiss for failure to state a claim, explaining, "[W]e see no error in the district court's conclusion that [the employer's] response as alleged in the complaint was sufficiently calculated to end the harassment [complained of by the plaintiff].").

21

was severe enough to alter the conditions of Willis's employment.  In addition, and for the reasons that follow, the Court concludes that Plaintiff Willis has adduced sufficient admissible record evidence from which a rational fact-finder could conclude that this harassment can be imputed to Defendants.

As an initial matter, the Court notes that Defendants have offered no record evidence that would refute any of the facts asserted by Plaintiff Willis in his deposition.  As a result, the Court finds that the current record establishes a question of fact as to whether certain of Plaintiff Willis' superior officers used their actual or apparent authority to further certain instances of harassment, or if they were otherwise aided in accomplishing the harassment by the existence of the agency relationship.  For example, Plaintiff Willis testified that a sergeant was present when a deputy pushed Willis over a table, climbed on top of Willis, and made inappropriate sexual gestures toward Willis.  In addition, Plaintiff Willis testified that, during a separate incident (in which a fellow deputy continuously popped Willis' "belt keeper," and Willis threatened to "crack" the deputy "in the mouth"), Sergeant Putnam intervened and accused Willis of calling the other deputy a "cracker."

Moreover, the Court finds that, based on the current record, a rational fact-finder could conclude that Defendants failed to provide a reasonable avenue of complaint.  This is so for two reasons.  First, the Second Circuit has made clear that, generally,"[t]he question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury."  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1181 (2d Cir. 1996) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) [noting that whether employer has taken reasonable steps to remedy discrimination is question of fact]).  This is true even where the employer has a procedure in place regarding harassment claims.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57,

22

72 (1986) ("[T]he mere existence of a grievance procedure and a policy against discrimination, coupled with [Plaintiff's] failure to invoke that procedure," is not enough to "insulate [the employer] from liability.").[9]

Second, while various of the harassment ceased after Plaintiff Willis complained, other of Willis' complaints appear to have been sometimes ignored, creating a question of fact as to whether the procedures set up by the employer to prevent further harassment were reasonable, and/or whether the remedial actions taken by the employer in response to Willis' complaints were reasonable.  This finding is supported by the fact that (1) there were multiple instances in which Plaintiff Willis was subjected to the same, or similar, types of harassment, despite complaining of the harassment to supervisors, and (2) on at least one occasion, a supervisor witnessed wholly inappropriate harassing conduct and took no action against the harassing employee.

### a.    Racial Harassment

Three of the incidents of racial harassment alleged by Plaintiff Willis were the subject of complaints.[10]  Based on the current record, whether reasonable remedial action was taken by

---

[9]      *See also Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1181 (2d Cir. 1996) (a per se rule that employee "misconduct cannot be imputed to [the] employer because [the employer] provided a procedure for use by aggrieved employees and the plaintiff had recourse to that procedure oversimplifies the required analysis.  We know of no authority, and none has been drawn to our attention, to support the defendant's suggestion of an alternative per se rule that the availability of a complaint procedure and an investigation of the complaint under that procedure, standing alone, requires [the court] to reach the legal conclusion that the misconduct of a co-worker cannot be imputed to the employer").

[10]      According to Plaintiff Willis, in 1999, while working in the kitchen, he heard from the manager of the kitchen at the jail that Captain Albanese had asked the manager to create a list of black people whom he had witnessed eating the kitchen's food.  (Dkt. No. 40, Part 2, ¶ 34 ["he had been told . . . to create a list of only black deputies who ate in the kitchen"]; Dkt. No. 36, Part 16, at 86-87 ["And [the manager] said, Captain Albanese wanted a list of people who

Defendants in response to Plaintiff's complaints is a genuine issue of material fact.

In addition, it should be noted that two other incidents of racial harassment alleged by

Plaintiff apparently occurred *before* the filing of the first action.[11]  The Court has found no

_____

[the manager] witnessed eating in the kitchen"].)  Along with Plaintiff Willis' name, two other black Deputies, Chavers and Lawrence, were on the list.  (*Id*.)  Plaintiff Willis told the manager that Deputies Chavers and Lawrence did not eat in the kitchen.  (*Id*.)  The manager said he was told to put their names on the list.  (*Id*.)  Later the same day, the manager told Sergeant Lagozzi that he would have to pay for the food he took from the kitchen because Plaintiff Willis was watching and he "would be a witness."  (Dkt. No. 40, Part 2, ¶ 36; Dkt. No. 36, Part 16, at 87-88.)  Plaintiff Willis does not indicate if there were consequences to being named on the list.

In addition, according to Plaintiff Willis, sometime between 2000 and 2001, he went to Sheriff Emergency Response Team training–a team in which he was the only black member.  (Dkt. No. 40, Part 2, ¶ 37; Dkt. No. 36, Part 16, at 89-90.)  At the training, Assistant Chief Wazlewski played a video entitled "Corruption in Corporate America" that allegedly depicted only African Americans involved in gang-related incidents.  (Dkt. No. 40, Part 2, ¶ 38; Dkt. No. 36, Part 16, at 91.)   After the video was shown, Plaintiff Willis spoke to Chief Callisto about his concern that the video was out of context and unfairly racial.  (Dkt. No. 40, Part 2, ¶ 40; Dkt. No. 36, Part 16, at 92.)  Chief Callisto responded that he would not show the video again; furthermore, to Plaintiff Willis' knowledge, the video was not shown again.  (Dkt. No. 36, Part 16, at 93.)

Finally, according to Plaintiff Willis, sometime between 2000 and 2002, Sergeant Finch's wife, Nurse Finch (whose role within the Sheriff's Department is unknown to the Court) called Plaintiff Willis a "nigger."  (Dkt. No. 40, Part 2, ¶ 18; Dkt. No. 36, Part 16, at 81.)  When Plaintiff Willis asked her whether she had a problem with African Americans, she responded, "No, everybody should owe [sic] one."  (*Id*.)  Plaintiff Willis reported the comments, but alleges that there was no follow-up undertaken.  (Dkt. No. 40, Part 2, ¶ 18.)  Plaintiff Willis, however, does not say how he made his report, or to whom it was made.

[11]      According to Plaintiff, sometime during the 1990s (Plaintiff is unable to provide a specific date or year), Sergeant Earl Smith from Internal Affairs questioned Plaintiff about a report that Plaintiff had threatened a white inmate at knife point.  (Dkt. No. 40, Part 2, ¶ 9; Dkt. No. 36, Part 16, at 59.)  After explaining to Sergeant Smith that he did not threaten any inmates, Plaintiff never heard from Internal Affairs about who made the allegedly false accusation against him.  (Dkt. No. 40, Part 2, ¶ 10; Dkt. No. 36, Part 16, at 60.)

In addition, according to Plaintiff, in either 1996 or 1997, an inmate sucker-punched Plaintiff during a transport through the Public Safety Building, and a physical altercation ensued.  (Dkt. No. 40, Part 2, ¶¶ 13-14; Dkt. No. 36, Part 16, at 53-55.)  None of the accompanying white deputies attempted to assist Plaintiff until after Plaintiff gained control of the inmate and had suffered several blows.  (Dkt. No. 40, Part 2, ¶ 15; Dkt. No. 36, Part 16, at 55.)  Following the altercation, Plaintiff wrote a report explaining the event.  (Dkt. No. 40, Part 2, ¶ 16; Dkt. No. 36, Part 16, at 55.)  In response, Department authorities brought Plaintiff up on charges of failing to

24

authority for the proposition that these claims may be considered in determining whether the

remedial actions taken by the employer in response to Plaintiff Willis' complaints were

reasonable.[12]

Finally, it should be noted that three other incidents of racial harassment alleged by

Plaintiff Willis apparently occurred *after* the filing of his Amended Complaint in this action.[13]  In

the event that Plaintiff Willis wishes to have these incidents considered by a jury, Plaintiff Willis

will be granted leave to file a Second Amended Complaint, out of special solicitude to him as a

*pro se* civil rights litigant.  However, Plaintiff Willis is advised that, should he decide to file a

Second Amended Complaint, Defendants will be granted leave to file a second motion for

---

assist one of his accompanying deputies.  (Dkt. No. 40, Part 2, ¶ 17; Dkt. No. 36, Part 16, at 55.)
However, after an investigation, the charges were dropped.  (Dkt. No. 36, Part 16, at 57.)

[12]     *Cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (noting that
"only incidents that took place within the timely [EEOC] filing period are actionable").

[13]     According to Plaintiff Willis, in 2006, he was told by Deputy Hadder (a white
male) that Deputies Brown and Feldman (both white males) instructed him and Deputy Southern
(a white male) to stop working with Willis because Willis "was working against the cause."
(Dkt. No. 36, Part 16, at 85.)  Plaintiff Willis wrote up a report, but it is not clear based on the
record whether, and to what extent, Department authorities responded to the report. (*See id*. at
84-85.)
        In addition, according to Plaintiff Willis, in 2007, he and Deputy Adams arrived late to
work on the same day.  (Dkt. No. 36, Part 16, at 104.)  Sergeant Putnam required both men to
write a report indicating why they were late.  (*Id*. at 105.)  At the time, Plaintiff Willis had been
late to work only twice in seven years, but each time had been required by his sergeant to write
such a report.  (*Id*. at 104.)  Conversely, Deputy Adams had frequently been late to work but had
never before been required to write such a report.  (*Id*.)
        Finally, according to Plaintiff Willis, at some point in 2004, a fellow Deputy
continuously popped Willis' "belt keeper."  (Dkt. No. 36, Part 16, at 100.)  Plaintiff Willis asked
the Deputy to stop, but when he did not stop, Willis threatened to "crack [the other deputy] in the
mouth."  (*Id*.)  At that point, Sergeant Putnam intervened and asked Plaintiff Willis if he just
called the other deputy a "cracker."  (*Id*.)  Plaintiff Willis does not indicate when in 2004 the
incident occurred, and the incident is not referenced in either Willis' original Complaint or
Amended Complaint, filed on July 16, 2004, and August 5, 2004, respectively.

25

summary judgment, out of fairness to them, and in the interest of judicial economy.

### b.    Sexual Harassment

One of the incidents of sexual harassment alleged by Plaintiff Willis occurred *after* the

filing of the Amended Complaint in this action.[14]  As stated above, in the event that Plaintiff

Willis wishes to have this incident considered by a jury, he will be granted leave to file a Second

Amended Complaint.  However, should Plaintiff Willis decide to file a Second Amended

Complaint, Defendants will be granted leave to file a second motion for summary judgment.

Two of three other incidents of sexual harassment alleged by Plaintiff Willis were the

subject of complaints by him.[15]  Based on the current record, whether reasonable remedial action

---

[14]      According to Plaintiff Willis, sometime in 2006, Deputy Mitchell poked him when he arrived at the office. (Dkt. No. 36, Part 16, at 98-99.)  Plaintiff Willis told Deputy Mitchell not to touch him, and that he did not want to be bothered. (*Id.* at 99.)  Deputy Mitchell then walked over to Plaintiff Willis, grabbed his arm and told Willis that he could touch him if he wanted. (*Id.*)  Plaintiff Willis pushed Deputy Mitchell's arm away and grabbed him by the throat and "smashed him." (*Id.*)  In response, Sergeant Ziamba asked Deputy Mitchell (and only Deputy Mitchell) to write a report on what had happened. (*Id.*)

[15]      According to Plaintiff Willis, in August 2000, while Willis was still on transport detail, Deputy Adams allegedly walked behind Willis and pushed a pen into Willis' anus. (Dkt. No. 40, Part 2, ¶ 29; Dkt. No. 36, Part 16, at 75-76.)  When Plaintiff Willis jumped and turned around to confront Deputy Adams, Deputy Adams stated, "What's that, an orgasm?" (*Id.*)  Plaintiff Willis does not state whether he reported this event; however, he concedes that this event was the last time that Deputy Adams harassed him. (Dkt. No. 36, Part 16, at 76.)
In addition, according to Plaintiff Willis, sometime during or after 2000, Deputy Don Brown, a white male, approached Willis from behind, wrapped his arms tightly around Plaintiff, and then forced Willis over a table. (Dkt. No. 40, Part 2 ¶¶ 30-31; Dkt. No. 36, Part 16, at 78.)  When Plaintiff Willis fell across the table, Deputy Brown climbed on top of Willis and made inappropriate sexual gestures. (*Id.*)  Everyone present in the room, including Sergeant Ryan, simply stood by and watched. (Dkt. No. 40, Part 2, ¶ 31 ["Sergeant Ryan was present and did not act."]; Dkt. No. 36, Part 16, at 80 ["So when [Deputy Brown] did that to me, Sergeant Ryan . . . said [to another deputy] that I was a player with four fouls, and the rest of the team was trying to draw the fifth foul . . . . But he couldn't do nothing about it, because he wasn't my sergeant."]).  Plaintiff Willis subsequently filed a complaint against Deputy Brown in the form of a written report to Sergeant Earl Smith; Plaintiff Willis alleges that nothing was done to Deputy Brown. (Dkt. No. 40, Part 2, ¶ 32; Dkt. No. 36, Part 16, at 79-80.)  Deputy Brown, who continues to

26

was taken by Defendants in response to Plaintiff Willis' complaints is a genuine issue of material

fact.

c.      Other Harassment

Three incidents of harassment alleged by Plaintiff Willis–which do not appear to be

racial or sexual in nature–apparently occurred *after* the filing of the Amended Complaint in this

action.[16]  As stated above, in the event that Plaintiff Willis wishes to have these incidents

_____

work in the transport unit with Plaintiff Willis, no longer touches Willis; however, Deputy
Brown instructs others in the unit to stay away from Willis.  (Dkt. No. 36, Part 16, at 80.)
Plaintiff Willis has also reported this behavior to superiors.  (*Id*. at 80-81.)

Finally, according to Plaintiff Willis, sometime in or around 2000, he was sitting at his
desk when Deputy White, a white man, approached Willis, complained that his genitals itched,
and asked Willis to scratch his genitals.  (Dkt. No. 36, Part 16, at 112-13.)  Deputy White then
leaned his thigh up against Plaintiff Willis' leg and continued to complain of the itch until Willis
asked him, "Where?"  (*Id*. at 113.)  When Deputy White opened his legs, Plaintiff Willis grabbed
White's genitals in an attempt to remove them from Deputy White's body.  (*Id*. at 113-14.)
Plaintiff Willis subsequently filed a report against Deputy White but, to Willis' knowledge,
Deputy White was never disciplined.  (*Id*. at 115.)

[16]      According to Plaintiff Willis, sometime in 2005, he received two messages on his
cell phone during work over a period of two days, and Deputy White witnessed Willis retrieve
both messages.  (Dkt. No. 36, Part 16, at 94.)  On both occasions, Deputy White made comments
to Plaintiff Willis, effectively accusing him of being a drug dealer.  (*Id*.)  In addition, according
to Plaintiff Willis, sometime in 2006, he was speaking to an inmate outside the courtroom after
the inmate's proceeding when Deputy Bingham, who was standing just inside the courtroom,
looked at Willis and the inmate and yelled, "Shut the fuck up."  (Dkt. No. 36, Part 16, at 95-96.)
Plaintiff Willis subsequently confronted Deputy Bingham about the incident, and Bingham said
he was yelling at the inmate.  (*Id*. at 97.)   Nonetheless, Plaintiff Willis reported the incident to
Sergeant Ziamba.  (*Id*.)  Ziamba allowed Plaintiff Willis and Bingham to meet with each other in
private and work out the conflict themselves, but during their meeting they were unable to reach
a resolution, and Bingham ended up walking out of the room.  (*Id*. at 97-98.)  Plaintiff Willis
then followed Bingham out of the room and yelled in a room full of twenty-five people that
Bingham had difficulty distinguishing between the officers and the inmates.  (*Id*. at 98.)  When
Plaintiff Willis reported back to Sergeant Ziamba and told him what had occurred, the sergeant
allegedly laughed.  (*Id*.)

In addition, according to Plaintiff Willis, on an unspecified date, Deputy Apantay, a
Latino male, slammed Willis against a wall for no reason after Willis finished transporting an
inmate back to the jail.  (Dkt. No. 36, Part 16, at 83-84.)  (Regarding the date of this incident, it
is worth noting that the incident is not referenced in either Plaintiff Willis' original Complaint or

considered by a jury, Willis will be granted leave to file a Second Amended Complaint. However, should Plaintiff Willis decide to file a Second Amended Complaint, Defendants will be granted leave to file a second motion for summary judgment.

Finally, it should be noted that one other incident of harassment alleged by Plaintiff Willis–which does not appear to be either racial or sexual in nature–does not appear to have been the subject of a complaint by him.[17]

For all of these reasons, the Court denies Defendant's motion for summary judgment on Plaintiff Willis's hostile work environment claim.

**E.     Claim of Disparate Treatment**

Turning to Plaintiffs' claims of disparate treatment, Defendants argue that Plaintiff Willis' claim for disparate treatment must be dismissed because none of the incidents that Plaintiff Willis refers to gives rise to liability for disparate treatment. In response, Plaintiff Willis argues that Caucasian deputies at the Sheriff's Department are punished less severely than black deputies, and Defendants are liable for such disparate treatment.

_____

Amended Complaint, filed on July 16, 2004, and August 5, 2004, respectively.) When Plaintiff Willis asked Apantay why he slammed Willis into the wall, Apantay allegedly said "he wanted to see what [Willis] would do." (*Id.*) It is unclear whether Department authorities were notified of this incident. (*Id.*)

[17]     According to Plaintiff Willis, on or about June 25, 2004, two white officers, one male and one female, were engaged in an argument with one another in the open booking area. (Dkt. No. 36, Part 16, at 62.) Plaintiff Willis intervened in the argument, telling the officers that they should separate. (*Id.* at 63.) In response, the female deputy stated that it was not Plaintiff Willis' business. (*Id.*) Plaintiff Willis responded that it was his business, and that the conversation should be brought to administration. (*Id.*) The dispute ended, and the female officer subsequently filed internal charges against Plaintiff Willis of sexual harassment, racial harassment and marital status harassment with the Sheriff's Department authorities. (*Id.*) Department authorities investigated the matter, and the charges were dropped. (*Id.* at 64.)

"A plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate, in applying the *McDonnell Douglas* test, that he was subject to an adverse employment action and that a similarly situated employee not in the relevant protected group received better treatment." *Carter v. New Venture Gear, Inc.*, 07-CV-4672, 2009 WL 393611, at *2 (2d Cir. Feb. 18, 2009) (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 [2d Cir. 2001]). "Specifically, a plaintiff must show that he engaged in an act of 'comparable seriousness,' but was punished more severely than similarly situated coworkers based on an application of disciplinary rules or a code of conduct." *Carter*, 2009 WL 393611, at *2 (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 40 [2d Cir. 2000]).

After carefully reviewing the record, the Court finds that Plaintiff Willis has provided no admissible record evidence from which a rational fact-finder could conclude that similarly situated black workers were punished differently than coworkers of a different racial class for actual, comparable incidents.  In his deposition, Plaintiff Willis testified that in 1999 he, along with two other black deputies, were put on a list that prohibited them from eating food in the kitchen at the Public Safety Building.  According to Plaintiff Willis, although the purpose of the list was to prevent people from taking free food, the two other deputies never once took free food, while Caucasian deputies often took free food.

As an initial matter, the Court finds that Plaintiff Willis acknowledges that he took free food when he worked in the kitchen.  Therefore, his complaint is really that the other two black deputies were on the "list" despite the fact that he never once saw them take free food when he worked in the kitchen, while he did see Caucasian deputies take free food.  Because this complaint does not allege facts plausibly suggesting that Plaintiff was subject to adverse employment action, Plaintiff cannot succeed on his claim of disparate treatment on this ground.

In the alternative, this claim fails because Plaintiff Willis has offered no admissible record evidence that this list was somehow racially motivated. To the contrary, the record evidence suggests that there was no racial motivation behind the list, because there were black employees employed at the Sheriff's Department in 1999 who were not on the list.

In addition, in his deposition, Plaintiff Willis testified that in 2007 he arrived late to work–for only the second time in his career as a deputy–and was asked to write a report explaining his tardiness. According to Plaintiff Willis, a Native American deputy came in late almost every day, but was asked only to write a report on the day that both he and Plaintiff Willis arrived late. The Court finds that a sergeant's failure to always demand a report from the Native American deputy who is often late does not give rise to disparate treatment. The fact is that when Plaintiff Willis was asked to write a report, the Native American deputy was also asked to write a report. In sum, Mr. Willis suffered no disparate treatment.

Finally, in his deposition, Plaintiff Willis testified that, when he was involved in an altercation with a Native American deputy in 2000 stemming from the deputy subjecting Plaintiff Willis to improper sexual suggestions, the resulting punishment that each was assessed was disparate. Specifically, according to Plaintiff Willis, both he and the other deputy had their weapons removed for five days, were forced to attend anger management, and were reassigned to the jail, but only he was forced to mop the floors. The Court notes that the Chief investigated this incident and held a conflict resolution session, during which the other deputy was forced to acknowledge that Plaintiff Willis deserved to be treated with respect. The Court notes also that, by his own admission, Plaintiff Willis initiated physical contact with the other deputy. The fact that Plaintiff Willis was ordered to mop the floors for being the first aggressor does not amount to an actionable claim. The incident was investigated, and both men were reprimanded.

Disagreement with the way a supervisor handles a situation does not amount to unequal treatment.

As a result, the Court dismisses Plaintiff Willis' claim for disparate treatment on the alternative ground that it lacks sufficient record evidence.

### F.     Claims Pursuant to 42 U.S.C. § 1981

Turning to Plaintiff Willis' claims pursuant to the Civil Rights Act of 1991, Defendants argue that they cannot be subjected to municipal liability under 42 U.S.C. § 1981 because Plaintiff Willis has failed to allege facts plausibly suggesting a custom or policy that led to any constitutional deprivation that Willis claims to have suffered.  In addition, Defendants argue that Plaintiff Willis' improper supervision claim must fail because Willis has not adduced admissible record evidence from which a rational fact-finder could conclude that Defendants acted with deliberate indifference.

In response, Plaintiff Willis argues that municipal liability is appropriate because a sergeant witnessed a deputy harass, and physically touch, him in a sexually inappropriate manner, yet no action was taken against the deputy.  Plaintiff Willis further argues that he reported the deputy's conduct up the chain of command, to a Lieutenant and Captain, but they also chose to do nothing about the incident.  Finally, Plaintiff Willis argues that this inaction was caused by his race.

"A municipality can be liable for violating Section 1981 only if the injury at issue resulted from the execution of a racially discriminatory 'policy or custom.'"  *Chin v. New York City Hous. Auth.*, 575 F. Supp.2d 554, 561 (S.D.N.Y. 2008) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 [1989] [other citations omitted]).  "Official policy traditionally takes the form of an ordinance, regulation, or decision officially adopted and promulgated by the

municipality's officers, while a qualifying custom consists of a longstanding practice that constitutes the standard operating procedure of the local governmental entity." *Chin*, 575 F. Supp.2d at 561 [internal quotation marks and citations omitted].

"[M]unicipalities are not vicariously liable for the actions of their employees under a theory of respondeat superior." *Id*. [citations omitted].  In addition, "[b]ecause liability hinges on the distinction between making policy and executing policy, when plaintiffs allege municipal liability for the actions of an individual, courts must pay special attention to the authority granted that individual and the theory of causation being offered." *Id*. at 562 [citations omitted].

"[A] municipality cannot be liable under Section 1981 when its only connection to the discriminatory or retaliatory acts at issue is that its employees committed such acts[.]" *Id*. at 563.  However, "a municipality can be liable if it evinced such a deliberate indifference to the allegations of discrimination as to show that the defendant intended the discrimination to occur." *Id*. [internal quotation marks and citations omitted].  "To prove deliberate indifference, plaintiffs must demonstrate: (1) that municipal officials with final policymaking authority had notice of the illegal conduct; (2) that the need for corrective action was obvious; and (3) that officials nevertheless chose to ignore the issue." *Id*. [citation omitted].

After carefully reviewing the record, the Court concludes that Plaintiff Willis has not offered admissible record evidence from which a rational fact-finder could infer the existence of a custom or policy of the County that led to any alleged constitutional violations that Plaintiff Willis has suffered.  First, the Court finds that the inaction of the supervisors does not amount to an official policy.  Second, the Court finds that this isolated incident that Mr. Willis relies on to assert the existence of a policy or custom of harassment, without more, does not amount to "a longstanding practice that constitutes the standard operating procedure of the [County]." *Chin*,

575 F. Supp.2d at 561.  This is because a single incident cannot be viewed as a "persistent and widespread discriminatory practice."  *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  The Court notes also that, during his deposition, Plaintiff Willis acknowledged on more than one occasion that it is not the policy of the Sheriff's Department to permit, foster or further the offensive conduct that he complained about.

Finally, the Court finds that Plaintiff Willis has failed to offer any record evidence that would demonstrate deliberate indifference to his complaints on the part of Defendants. Specifically, Plaintiff Willis failed to offer any evidence that would suggest (1) that those with final policymaking authority had notice of the incidents that Mr. Willis complained of, or (2) that they had notice of the incidents, but nonetheless were deliberately indifferent to the allegations.

As a result, the Court dismisses Plaintiff Willis' Section 1981 claim on the alternative ground that it lacks sufficient record evidence.

IV.    **CONCLUSION**

For the reasons set forth above, the Court concludes (1) that Plaintiff Pitts's claims should be dismissed in their entirety, and (2) that only Plaintiff Willis's hostile work environment claim should survive summary judgment.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 36) is **GRANTED** in part and **DENIED** in part, such that (1) Plaintiff Pitts's claims are **DISMISSED** in their entirety, and (2) only Plaintiff Willis' hostile work environment claim survives Defendants' motion summary judgment; and it is further

**ORDERED** that, out of special solicitude to him as a *pro se* civil rights litigant, Plaintiff

Willis is *sua sponte* **GRANTED** leave to file a **SECOND AMENDED COMPLAINT** arising from incidents of harassment occurring after the date on which he filed the Amended Complaint in this action; and it is further

   **ORDERED** that any such Second Amended Complaint (1) must be filed within **THIRTY (30) DAYS** of the date of this Decision and Order, (2) must consist solely of paragraphs numbered consecutively to the paragraphs contained in the Amended Complaint (i.e., starting with Paragraph Number "108"), (3)  must be based solely on events occurring after the date of the Amended Complaint (i.e., August 5, 2004) but before the date of his deposition in this action (i.e., May 24, 2007), and (4) must allege only facts in support of Plaintiff Willis' hostile work environment claim; and it is further

   **ORDERED** that, in the event that Plaintiff Willis elects to file such a Second Amended Complaint, Defendants will be *sua sponte* granted an extension to file a second motion for summary judgment to be filed within **SIXTY (60) DAYS** from the date that the Second Amended Complaint is filed with the Clerk's office.

Dated:  September 29, 2009
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge